UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUDITH MARIA SOBOL,

Petitioner,

v.

No. 2:25-cv-12550
Honorable Susan K. DeClercq

United States District Judge

JEREMY HOWARD,

Respondent.
_______________________________/

**OPINION AND ORDER DISMISSING THE PETITION FOR A WRIT OF HABEAS CORPUS (ECF No. 1), DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

Petitioner Judith Maria Sobol, confined at the Huron Valley Women's Correctional Facility in Ypsilanti, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging her state court conviction for second-degree murder, MICH. COMP. LAWS § 750.317, and possession of methamphetamine, MICH. COMP. LAWS § 333.7403(2)(b)(i). For the reasons that follow, the petition for a writ of habeas corpus, ECF No. 1, will be dismissed with prejudice.

## I. BACKGROUND

Sobol was convicted following a jury trial in the Berrien County Circuit Court. ECF No. 1 at PageID.1–2. This Court recites verbatim the relevant facts relied upon

by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See e.g.*, *Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009).

> This case arises from the death of three-year-old OM on June 20, 2022, after she was detached from her ventilator and deprived of oxygen. OM had a syndrome that caused facial paralysis, weakness in her upper body, and an inability to swallow. OM also had epilepsy; however, she had not experienced a seizure in the year before her death. OM was physically incapable of sitting up by herself, and she could only hold up her head for less than five minutes at a time. Because of a loss of digital dexterity, OM was unable to grab her toys, and she was unable to walk. OM was unable to communicate verbally, but she used other nonverbal methods. OM made physical improvements under her course of treatment, and she was expected to live a full life.
>
> Because of her conditions, OM had a tracheostomy tube attached to a stoma in her neck. The tracheostomy tube connected her to a ventilator to facilitate her breathing. To prevent decannulation, the tracheostomy tube was fastened to OM's neck with tightly wrapped fabric and Velcro. The ventilator and tracheostomy tube were attached together using various components and adapters. If OM's tracheostomy tube detached, it would still be attached around her neck because of its Velcro ties, but the ventilator would automatically sound an alarm because it would detect an improper airflow. OM always needed to be connected to the ventilator to facilitate breathing. She also used a feeding tube and was connected to a pulse oximeter that would sound an alarm if her blood-oxygen levels dropped below a certain level.
>
> OM lacked the strength to unfasten the Velcro from her tracheostomy tube. Moreover, OM tended to chew her fingernails off, so, to combat this, OM wore arm braces to prevent her from bending her arms at her elbows. OM's mother never observed OM remove the tracheostomy tube and never saw it dislodge from coughing. It would decannulate if OM rolled on her side, but the tracheostomy tube stopped detaching after it was resized to fit OM's growing body.
>
> OM had home healthcare nursing between five or six days, and four or five nights, a week. Defendant, a nurse with a master's degree in

nursing, had been OM's night nurse for approximately six to eight months at the time of OM's death. Her responsibilities included monitoring OM overnight, performing OM's tracheostomy routine, and administering treatment. Defendant's shifts at the time of the incident were 11:00 p.m. until 7:00 a.m.

On the night of June 19, 2022, OM had already been put to bed by approximately 8:30 p.m., which included, among other things, changing her tracheostomy ties and placing her arm braces. OM was attached to her ventilator, her tracheostomy tube was secured, all the necessary attachments were secured, and she was connected to her pulse oximeter. It was expected that defendant would arrive for her shift at 11:00 p.m., but she arrived an hour late, appearing frazzled and apologetic. OM's father updated defendant on OM's conditions, including the fact that her tracheostomy care routine had already been performed for the night, and he went to bed, leaving OM alone with defendant.

OM's mother awoke in the middle of the night, heard OM's alarms sounding, and proceeded to OM's bedroom. She saw defendant slumped in a chair mumbling to herself. OM's mother assumed that defendant was having a medical emergency. OM's mother then noticed that OM's tracheostomy tube was missing. OM's skin was pale, OM was cold to the touch, and she was not breathing. OM's parents began CPR and attempted to insert a different tracheostomy tube into OM, but they were unsuccessful because all the pieces to her ventilator were taken apart and thrown around the room. They called 911. Defendant began pulling items out of OM's medical "go bag" and was throwing the items; defendant was told to get out of the room. Defendant repeatedly stated that OM was dead, that she killed OM, and that her life was over, as she proceeded to hit her face into the living room floor.

Arriving paramedics found that OM's heart was beating only once every 10 to 15 seconds. Responding officers observed defendant in the fetal position with her hands behind her back, making erratic and furtive movements. One officer described defendant as appearing "possessed," with her eyes wide, but her pupils pinpoint, indicating that she was on narcotics. Defendant stated, "I killed the baby, I'm no [sic] meth, I haven't slept in three days, take me away." Defendant admitted to responding officers that she had methamphetamine in her purse; officers searched defendant's purse and found drug paraphernalia,

> including two methamphetamine pipes, several syringe caps, and a crystalline substance. The pipes subsequently tested positive for methamphetamine. Defendant's blood was found to contain amphetamine and methamphetamine. A search of defendant's vehicle revealed a large number of syringes, which also tested positive for methamphetamine.
>
> OM was pronounced deceased at the hospital. While OM's parents were saying their goodbyes to her, they found OM's missing tracheostomy tube tangled in the hair on the back of OM's head, with the Velcro unfastened. Both of OM's arm braces were still properly fastened until the paramedics removed them. The coequal causes of death were found to be complications of OM's medical conditions, with the manner of death as homicide.
>
> During her interview with law enforcement, defendant could not remember what time she arrived at OM's residence or whether she took OM's tracheostomy tube out, and defendant asserted that she may have blacked out. At one point, defendant asserted that she thought that she was in a dream. Defendant admitted to using methamphetamine all week, coming down from a high, and using methamphetamine on the night of June 19, 2022.

*People v. Sobol*, No. 366349, 2024 WL 4248930, at *1–2 (Mich. Ct. App. Sept. 19, 2024) (footnote omitted), *leave denied*, 16 N.W.3d 102 (Mich. 2025) (mem.).

Sobol seeks a writ of habeas corpus on the following grounds: (1) there was insufficient evidence to support her second-degree murder conviction, ECF No. 1 at PageID.5, and (2) Sobol's sentence of 30–75 years in prison on the second-degree murder conviction was disproportionate and the judge erred in departing above the sentencing guidelines range, *id.* at PageID.7.

## II. LEGAL STANDARD

Section 2254(d), as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410–11. Rather, "[a] state court's determination that a claim lacks merit precludes

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

## III. DISCUSSION

### A. Sufficiency of the Evidence

Sobol alleges that there was insufficient evidence to convict her of second-degree murder, arguing that the evidence, at most, shows that she is guilty of involuntary manslaughter. ECF No. 1 at PageID.5.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). But the crucial question on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Va.*, 443 U.S. 307, 318 (1979). A court need not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant inquiry is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the requisite elements of the crime beyond a reasonable doubt." *Id.* at 318–19 (internal quotation marks and citations omitted; emphasis original).

When considering a challenge to the sufficiency of the evidence to convict, the reviewing court gives circumstantial evidence the same weight as direct evidence. *United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (citation omitted); *see also Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) ("A conviction may be sustained based upon nothing more than circumstantial evidence.")

More importantly, a federal habeas court cannot overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. *See Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *Id.* "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Indeed,

for a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012) (per curiam). A state court's determination that the evidence does not fall below that threshold "is entitled to considerable deference under AEDPA." *Id.*

Under Michigan law, the elements of second-degree murder are: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse."[1] *See Stewart v. Wolfenbarger*, 595 F.3d 647, 654 (6th Cir. 2010) (citing *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998)). "[M]alice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* (citing *People v. Aaron*, 299 N.W.2d 304 (Mich. 1980)). Additionally, "[t]he offense of second-degree murder 'does not require an actual intent to harm or kill, but only the intent to do an act that is in

[1] Respondent notes that the fourth element of justification or excuse may no longer be an independent element of second-degree murder. ECF No. 7 at PageID.354 n.1, citing *People v Spears*, 13 N.W.3d 20, 35 (Mich. Ct. App. 2023) (suggesting that lack of justification or excuse is not an element but "part of the 'cluster of ideas' of second-degree murder."); *but see People v. Morrow,* ---- N.W. 3d ---, 2025 WL 3558100, at *3 (Mich. Ct. App. Dec. 11, 2025) (reciting lack of justification or excuse as the fourth element); *People v. Schurr*, 29 N.W.3d 511, 523 (Mich. Ct. App. 2024) (same); *United States v. Jamison*, 85 F.4th 796, 803 (6th Cir. 2023) (same). This Court need not resolve this issue because Sobol does not contend that she had an excuse or justification.

obvious disregard of life-endangering consequences.'" *Id.* at 658 (quoting *People v. Aldrich*, 631 N.W.2d 67, 80 (Mich. Ct. App. 2001)).

Sobol argues that the evidence did not show that she knew that using methamphetamine would create a high probability that the victim's death would occur. ECF No. 1 at PageID.5. Stated differently, Sobol argues that her use of methamphetamine before her nursing shift was not an act of wanton or reckless disregard that the likely result of her actions would be the victim's death or serious injury. *Id.* She argues that at most she is only guilty of involuntary manslaughter. *See, e.g.*, *id*. at PageID.32 n.1. Involuntary manslaughter under Michigan law is the killing of another without malice or intent, "but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty." *Koras v. Robinson*, 123 F. App'x 207, 215 (6th Cir. 2005) (citing *People v. Clark*, 556 N.W.2d 820, 822 (Mich. 1996)).

The Michigan Court of Appeals rejected this argument, finding that there was sufficient evidence to support Sobol's conviction:

> It is undisputed that OM died; therefore, the first element of second-degree murder was satisfied. For the remaining elements, the prosecution's theory of the case was that defendant knowingly took methamphetamine and provided OM with improper care. Specifically, the prosecution argued that defendant herself removed OM's tracheostomy tube without replacing it or, alternatively, the tracheostomy tube decannulated and defendant, instead of reattaching the tracheostomy tube, threw components of the ventilation system

> around the room rendering it impossible for OM's parents to reconnect it to OM. Given her education and approximately eight months caring for OM overnight, the prosecution argued that defendant knew that OM could not breathe without the ventilation system.
>
> The prosecution presented sufficient evidence that defendant caused OM's death. Defendant was alone in the room with OM immediately before OM's disconnection from the ventilator. Earlier that night, OM was attached to her ventilator, her tracheostomy tube was tightly secured, all the necessary attachments were secured, and she was connected to her pulse oximeter. OM was too weak and lacked the digital dexterity to undo the Velcro securing her tracheostomy tube. Additionally, OM's arm braces prohibited her from lifting her hands to her mouth, and the braces were properly fastened to OM's arms until the paramedics removed them. Although OM had experienced seizures in the past, she had not had one in approximately a year, and, regardless, those seizures had not previously dislodged her tracheostomy tube. OM's parents found her disconnected from her ventilator, with all the pieces to the ventilator taken apart and strewn around the room. OM's tracheostomy tube was later found tangled up in the hair on the back of her head, with the Velcro unfastened.
>
> Taken together, this amounts to circumstantial evidence that defendant disconnected the tracheostomy tube and attachments to OM's ventilator, and scattered the attachments about the room, which caused OM to be unable to breathe given her conditions, causing her death. This evidence also supported the prosecution's alternate theory that the tracheostomy tube became dislodged on its own, and, rather than reattach the tracheostomy tube, defendant took the tube off and took apart the ventilator system, preventing others from reattaching OM to the ventilator. Therefore, the second element of second-degree murder was satisfied.

*Sobol*, 2024 WL 4248930, at *3–4.

The Michigan Court of Appeals also found that the prosecution had established the third critical element of malice—which is disputed by Sobol:

> It can be reasonably inferred that defendant was fully aware of OM's medical condition and the necessity of her remaining attached to the

> ventilation system because of her profession and the months she spent caring for OM. She knew the consequences if OM became disconnected from her ventilator. She knew she was the sole person charged with responding to a medical emergency when OM was under her supervision. Aware of the consequences, defendant came to work high on methamphetamine after three days without sleep. Regardless of whether defendant was experiencing the effects of methamphetamine use, or whether she was coming down from a high and experiencing hallucinations or extreme exhaustion from being awake for the preceding several days, she came to work in an unfit state, detached the tracheostomy tube, and took apart the ventilation system. Even under the prosecution's alternate theory that the tracheostomy tube became dislodged by accident; rather than reattaching the tracheostomy tube, record evidence supported that defendant removed the Velcro and threw the components of the ventilation system around the room. This rendered it impossible to reconnect OM to her ventilator and placed her life in immediate danger without oxygen. From the evidence in the record, it was reasonable for the jury to conclude that defendant acted in obvious disregard of life-endangering consequences to OM, a child with highly tailored medical needs, when she came to work high on methamphetamine and provided improper medical care. Accordingly, when viewed in the light most favorable to the prosecution, sufficient evidence was presented to justify a rational trier of fact in finding defendant guilty, beyond a reasonable doubt, of second-degree murder.

*Sobol*, 2024 WL 4248930, at *4 (citation omitted).

The Michigan Court of Appeals' decision was reasonable, which precludes habeas relief. When viewed in a light most favorable to the prosecution, a rational jury could find that Sobol acted in wanton and willful disregard of the life-endangering consequences that were likely to flow from her appearance at work while high on methamphetamine. Sobol's state led her to provide improper medical care to the victim, who was unable to care for herself. This evidence supports a conviction for second-degree murder. Although there may have been other evidence

in the record which contradicted these inferences and which could have supported a verdict of involuntary manslaughter, this Court is obliged to view the evidence in the light most favorable to the prosecution. *See e.g.*, *Williams v. Jones*, 231 F. Supp. 2d 586, 595 (E.D. Mich. 2002).

Again, the question is not whether this Court as a juror would have convicted Sobol of second-degree murder, or if this Court would have affirmed the conviction if reviewing it as part of the Michigan Court of Appeals. The question is whether the Michigan Court of Appeals reasonably concluded that the jury's finding that Sobol's actions reached the level of malice to support the second-degree murder conviction reached the threshold of bare rationality. Here, the jury's finding that Sobol showed a wanton and willful disregard for the life-threatening consequences to the victim is reasonable. In turn, the Michigan Court of Appeals reasonably found that the jury's verdict did not fall below the threshold of bare rationality. Therefore, Sobol is not entitled to habeas relief on her claim. *See, e.g.*, Coleman, 566 U.S. at 656–67.

**B. Sentencing**

Sobol next alleges that the sentence of 30–75 years should be set aside because the judge departed above the sentencing guidelines range, and the sentence is disproportionate "to the seriousness of the circumstances surrounding the offense and the offender." ECF No. 1 at PageID.7.

Sobol first claims that the judge improperly departed above the sentencing guidelines range of 180–300 months when imposing a minimum sentence of 30 years (360 months).

It is well-established that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citation omitted). To the extent Sobol's claim is one that the state trial court misapplied the Michigan Sentencing Guidelines, that claim is not a cognizable claim for federal habeas review, because it is a state law claim that does not independently support habeas relief. *See Kissner v. Palmer*, 826 F.3d 898, 904 (6th Cir. 2016) (order); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007); *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) (order). Therefore, Sobol's claim that the state trial court improperly departed above the sentencing guidelines range does not entitle her to habeas relief, particularly so in light of the fact that even if the judge departed above the sentencing guidelines range on the minimum sentence, Sobol's maximum sentence of 30–75 years was within the statutory range for the offense of conviction. *See Simpson v. Warren*, 662 F. Supp. 2d 835, 851 (E.D. Mich. 2009), *aff'd*, 475 F. App'x 51 (6th Cir. 2012).

Regarding the proportionality claim, Sobol fails to state a claim for federal habeas relief here as well. The United States Constitution does not require that sentences be proportionate. In *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991), a

plurality of the United States Supreme Court found that the Eighth Amendment does not contain a requirement of strict proportionality between the crime and sentence. Rather, the Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime. *See id.* at 1001 (Kennedy, J., concurring in part); *see also Cowherd v. Million*, 260 F. App'x 781, 785 (6th Cir. 2008) ("only an extreme disparity between crime and sentence offends the Eighth Amendment" (citation omitted)). A sentence within the statutory maximum generally does not normally constitute cruel and unusual punishment. *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000); *see also United States v. Layne*, 324 F.3d 464, 473–74 (6th Cir. 2003) (recognizing that courts should remain deferential to the state legislature's determination of the appropriate punishments for crimes). In short, as long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining "the type and extent of punishment for convicted defendants." *Williams v. New York*, 337 U.S. 241, 245 (1949).

Moreover, federal courts generally do not engage in a proportionality analysis except where the sentence imposed is death or life imprisonment without parole. *See United States v. Thomas,* 49 F.3d 253, 261 (6th Cir. 1995). Successful challenges to the proportionality of a particular sentence in non-capital cases are "exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272 (1980).

Sobol's sentence of 30 to 75 years in prison is within the statutory limits of the offense of second-degree murder. The trial judge sentenced Sobol to less than the maximum sentence of life imprisonment. This Court finds that Sobol's sentence was not so extreme or grossly disproportionate as to entitle her to habeas relief. *See, e.g.*, *Austin*, 213 F.3d at 302 (sentence of 40 to 60 years in prison for second-degree murder not disproportionate, even though it exceeded sentencing guidelines range of 12–25 years).

## IV. CONCLUSION

For the forgoing reasons, this Court dismisses the petition for a writ of habeas corpus, ECF No. 1, with prejudice.

This Court also denies a certificate of appealability. In order to obtain a certificate of appealability, a prisoner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484.

For the reasons stated in this opinion, a certificate of appealability is denied because Sobol failed to make a substantial showing of the denial of a federal constitutional right. *See, e.g.*, *Myers v. Straub*, 159 F. Supp. 2d 621, 629 (E.D. Mich. 2001). However, if Sobol chooses to appeal this Court's decision, she may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3). *See Foster v. Ludwick*, 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).

## V. ORDER

For the foregoing reasons, the Court **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus, ECF No. 1, and **DENIES** Petitioner a certificate of appealability. Petitioner is granted leave to appeal *in forma pauperis*.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: 10/16/2026